UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-2311

BIW DECEIVED, ET AL.,

Plaintiffs, Appellants,

v.

LOCAL S6, INDUSTRIAL UNION OF MARINE
AND SHIPBUILDING WORKERS OF AMERICA,
IAMAW DISTRICT LODGE 4,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Aldrich, Senior Circuit Judge, 

and Lynch, Circuit Judge. 



Jed Davis, with whom Linda Christ, Jim Mitchell and Jed 
Davis, P.A. were on brief, for appellants. 
Ralph L. Tucker, with whom James W. Case and McTeague, 
Higbee, McAdam, Case, Watson and Cohen were on brief, for 
appellee.



December 30, 1997


SELYA, Circuit Judge. In this procedural motley, a SELYA, Circuit Judge. 

band of plaintiffs the eponymous BIW Deceived locks horns

with Local S6 of the Industrial Union of Marine and Shipbuilding

Workers (the Union) over issues pertaining to removal and remand.

The peculiarities of this engagement impel us to adumbrate our

necessarily circuitous decisional path. After delineating the

relevant facts and procedural history, we address whether the

plaintiffs have waived their right to appeal either by inviting

the judgment or by failing to seek our intervention at an earlier

date. Finding no default, we proceed to the merits a journey

that requires us to touch upon doctrinal aspects of preemption

under federal labor law and to explore a question of first

impression concerning the exercise of federal question

jurisdiction in the context of the artful pleading doctrine. At

journey's end, we conclude that the plaintiffs' complaint

presents a colorable federal question and that, therefore, the

district court did not err when it refused to return the case to

a state venue.

I. BACKGROUND I. BACKGROUND

Because this action stumbled near the starting gate,

the record is stunted and the facts before us are sparse. We

present them as best they present themselves.

In the fall of 1995, Bath Iron Works (Bath or BIW)

hired a number of electricians and pipefitters. The Union

participated in the job interviews pursuant to the terms of an

existing collective bargaining agreement (the CBA). The

2

plaintiffs allege that during these interviews the Union told

them that they would "be employed at least until the expiration

of the current Union contract [August 1997]" and "probably until

the end of the decade;" that Bath "had more work for

electricians and pipefitters than it could handle;" and that Bath

"was hiring fewer electricians and pipefitters than it needed, so

that the employees would be assured of continuing employment."

The plaintiffs further allege that they relied on these

blandishments, accepted offers of employment, and left other jobs

to move to Maine and work for Bath. But, the plaintiffs say, the

Union had led them down a primrose path; they were laid off early

in 1996.

II. PROCEDURAL HISTORY II. PROCEDURAL HISTORY

Angered by this fecklessness, the former employees

joined together to form "BIW Deceived" and sue the Union in a

Maine state court.1 Their complaint alleged negligence,

fraudulent misrepresentation, fraud in the inducement, infliction

of emotional distress, loss of consortium, intentional

nondisclosure, and unjust enrichment. The Union promptly removed

the action to the federal district court. When the plaintiffs

sought remand on the ground that their suit involved only state-

law claims, the Union responded by asserting that all the

plaintiffs' claims were subject to preemption under the National

 

1Two of the plaintiffs are former employees' spouses. Since
their claims for loss of consortium are derivative, we refer to
the informal plaintiff class as if it were composed solely of ex-
employees.

3

Labor Relations Act (NLRA), 29 U.S.C. 151 et seq., and/or the 

Labor Management Relations Act (LMRA), 29 U.S.C. 185 et seq. 

Judge Carter resolved the removal/remand dispute in the

Union's favor. He denied the plaintiffs' motion, asserting in a

two-page order that "the claims for relief set forth in the

Complaint are all derivative from and dependent for their

resolution upon duties defined and imposed by federal law, which

law occupies the field and, by mandate of Congress, closes the

field to state regulation."

That order produced a strange reaction: the plaintiffs

moved for entry of final judgment in the defendant's favor. They

reasoned that, in refusing to remand, the district court had

"conclu[ded] that federal law preempts all state claims," and

that this conclusion "le[ft] nothing more to be litigated" in

that court. Judge Carter denied this motion without elaboration.

Shortly thereafter, Magistrate Judge Cohen presided

over a status conference during which the plaintiffs represented

that they had "no interest in [pressing] any federal-law claims"

and that they desired the entry of final judgment in order to

"appeal the [district court's] preemption ruling." The Union

agreed not to oppose the entry of judgment in its favor. The

next day, the plaintiffs moved for reconsideration and for entry

of final judgment, specifically "abandon[ing] any and all federal

claims." This time Judge Carter granted their motion and entered

final judgment, without prejudice to the plaintiffs' right to

seek review. This appeal followed.

4

III. APPELLATE JURISDICTION III. APPELLATE JURISDICTION

It is a federal court's obligation to assure itself of

the existence of subject matter jurisdiction even if no party

presses the question. See American Policyholders Ins. Co. v. 

Nyacol Prods., Inc., 989 F.2d 1256, 1258 (1st Cir. 1993). 

Consequently, we consider whether the odd procedural posture of

this case undermines our appellate jurisdiction.

In several circuits a party who consents to the entry

of judgment forfeits any right to appeal from that judgment.

See, e.g., Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 

1134, 1137 (5th Cir. 1992); Clapp v. Commissioner, 875 F.2d 1396, 

1398 (9th Cir. 1989). We have taken a slightly more

latitudinarian approach: while acknowledging that, with few

exceptions, "a party to a consent judgment is thereby deemed to

waive any objections it has to matters within the scope of the

judgment," Coughlin v. Regan, 768 F.2d 468, 469-70 (1st Cir. 

1985),2 we nevertheless have suggested that "it is possible for a

party to consent to a judgment and still preserve [its] right to

appeal" a previous ruling on a contested matter in the case, as

long as it "reserve[s] that right unequivocally." Id. at 470. 

Such a reservation occurred here. The record makes manifest that

the plaintiffs sought the entry of final judgment solely to

facilitate an appeal of the district court's refusal to remand

 

2The specific exceptions mentioned by the Coughlin court 
involve "a showing of either lack of actual consent, fraud in
obtaining consent, lack of federal jurisdiction, or mistake."
768 F.2d at 470.

5

the suit. Their initial motion for entry of final judgment asked

the court to enter a "final and appealable judgment;" the

magistrate's report of the status conference related that the

plaintiffs "simply seek the entry of final judgment so that they

may appeal the court's preemption ruling;" and the renewed motion

for entry of final judgment solicited the entry of a "final

judgment, without prejudice to the plaintiffs' right to seek

appeal."

This evidence clearly shows the plaintiffs' unequivocal

intention. Under Coughlin, then, we have discretion to accept 

the appeal insofar as it relates to a prior (contested) order

notwithstanding the plaintiffs' later consent to the entry of the

final judgment itself. See Coughlin, 768 F.2d at 470. In this 

instance, we are inclined to exercise that discretion in the

plaintiffs' favor.

Even so, our appellate jurisdiction is not free from

doubt. The parties treat this appeal as if Judge Carter

dismissed the suit because the various causes of action were

preempted, but this is an inaccurate characterization of what

actually transpired. There was no dismissal: while Judge Carter

expressed his belief that the plaintiffs' claims were preempted,

the only ruling that he made on a contested matter consisted of

denying the plaintiffs' motion to remand. This ruling did not

require a finding of preemption; it only required a finding that

the Union had made a colorable showing of federal jurisdiction.

See infra Part V. That the judge's remarks swept more broadly 

6

does not alter the reality of events. It is settled beyond

peradventure that a party can appeal only from an adverse order

or judgment, not from a judge's ruminations. See Logue v. Dore, 

103 F.3d 1040, 1047 (1st Cir. 1997); In re Admin. Warrant, 585 

F.2d 1152, 1153 (1st Cir. 1978). The plaintiffs could have

waited until the Union filed a dispositive motion (say, a motion

to dismiss or for summary judgment), but they chose not to do so.

Thus, the district court's order denying the plaintiffs' motion

to remand is the only order that is even potentially reviewable

in this proceeding.

The district court entered that order on July 3, 1996,

and the plaintiffs did not file their notice of appeal until

October 25, 1996. In some circuits, a disappointed suitor must

appeal the denial of a motion to remand within the standard

appeal period (here, thirty days, see Fed. R. App. P. 4(a)(1)), 

or else forever hold his peace. See Marshall v. Manville Sales 

Corp., 6 F.3d 229, 231 (4th Cir. 1993) (noting that the Fourth 

Circuit will not "disturb a district court's final judgment on

the basis of a defective removal when the plaintiff ha[s] failed

to seek an interlocutory appeal of the order denying remand");

Nishimoto v. Federman-Bachrach & Assocs., 903 F.2d 709, 713 (9th 

Cir. 1990) (holding that an objection to removal "is not

preserved unless an interlocutory appeal is filed challenging the

district court's order denying remand"). Other circuits 

including this one generally consider orders refusing remand to

be interlocutory orders, and thus a plaintiff whose remand

7

request has been rebuffed possesses no immediate right of appeal,

but retains the right to press his point by taking an end-of-case

appeal after the entry of final judgment. See Neal v. Brown, 980 

F.2d 747, 747 (D.C. Cir. 1992); Carriere v. Sears, Roebuck & Co., 

893 F.2d 98, 100 n.2 (5th Cir. 1990); Brough v. United 

Steelworkers, 437 F.2d 748, 749 (1st Cir. 1971). Accordingly, 

the entry of final judgment in this case paved the way for

appellate consideration of the order denying the motion to remand

and BIW Deceived's timely appeal is properly before us.

IV. THE LEGAL FRAMEWORK IV. THE LEGAL FRAMEWORK

There are three interlocking pieces to the applicable

legal framework. We trace their contours.

A. Preemption. A. Preemption. 

In the labor-law arena, preemption the displacement

of state law by the force of federal law is a familiar

phenomenon. Several different strains of preemption flourish in

this field, each possessing somewhat different roots and each

casting a uniquely configured shadow. Two of these preemption

theories bear upon the instant case.

1. 1. 

Section 301 of the LMRA, 29 U.S.C. 185, confers

federal jurisdiction over "[s]uits for violation of contracts

between an employer and a labor organization representing

employees in an industry affecting commerce." From this austere

beginning, the Supreme Court determined that it had the authority

to craft a federal common law that would effect section 301's

8

objectives. See Textile Workers Union v. Lincoln Mills, 353 U.S. 

448, 451 (1957). The Court subsequently declared that section

301 preempts a state-law claim "if the resolution of [that] claim

depends upon the meaning of a collective-bargaining agreement."

Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 

(1988).

We recently visited this corner of the law in Flibotte 

v. Pennsylvania Truck Lines, F.3d (1st Cir. 1997) [No. 

97-1197]. Citing United Steelworkers v. Rawson, 495 U.S. 362, 

369 (1990), and Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 

(1985), respectively, we explained that a state-law claim can

depend upon the meaning of a collective bargaining agreement in

either of two distinct ways: on the one hand, a claim can allege

the violation of a duty that arises from the CBA itself, or, on

the other hand, a claim can require a court to interpret a

specific provision of the CBA. See Flibotte, F.3d at  

[slip op. at 9]. "If a state-law claim depends upon the meaning

of the collective bargaining agreement in either of these ways 

that is, under Rawson's `duty' rubric or under Allis-Chalmers's 

`interpretation' rubric it is preempted." Id. 

Though section 301 is omnipotent within its sphere, it

is not endlessly expansive. The Court has warned that it "cannot

be read broadly to pre-empt nonnegotiable rights conferred on

individual employees as a matter of state law," Livadas v. 

Bradshaw, 512 U.S. 107, 123 (1994), and that "purely factual 

questions about an employee's conduct or an employer's conduct

9

and motives do not require a court to interpret any term of a

collective-bargaining agreement," Hawaiian Airlines, Inc. v. 

Norris, 512 U.S. 246, 261 (1994) (citation and internal quotation 

marks omitted). These cautions do not shrink the scope of

section 301 preemption, but simply emphasize that, for a claim to

arise under federal law, it must depend upon the meaning of the

collective bargaining agreement.

2. 2. 

Preemption also can occur by operation of the so-called

duty of fair representation (DFR). A union acting in its

representative capacity owes this duty to those on whose behalf

it acts. See Ford Motor Co. v. Huffman, 345 U.S. 330, 337 

(1953). The duty derives from the union's status qua exclusive 

bargaining agent. It implicates section 9(a) of the NLRA,3 and

"includes a statutory obligation to serve the interests of all

members without hostility or discrimination toward any, to

exercise its discretion with complete good faith and honesty, and

to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 

(1967).

 

3Section 9(a) provides in pertinent part:

Representatives designated or selected for
the purposes of collective bargaining by the
majority of the employees . . . shall be the
exclusive representatives of all the
employees . . . for the purposes of
collective bargaining in respect to rates of
pay, wages, hours of employment, or other
conditions of employment . . . .

29 U.S.C. 159(a).

10

A complaint that states a DFR claim "allege[s] a breach

by the Union of a duty grounded in federal statutes and . . .

federal law therefore governs [the] cause of action." Id. 

Consequently, state law is preempted whenever a plaintiff's claim

invokes rights derived from a union's duty of fair

representation. See Condon v. Local 2944, 683 F.2d 590, 594-95 

(1st Cir. 1982) (stating that "[a] union's rights and duties as

the exclusive bargaining agent in carrying out its

representational functions" collectively comprise a field in

which "the policy of the law is so dominated by the sweep of

federal statutes that legal relations which [those rights and

duties] affect must be deemed governed by federal law having its

source in those statutes, rather than by local law") (citation

and internal quotation marks omitted).

B. Standard of Review. B. Standard of Review. 

Although the parties gloss over the point, we emphasize

that the only appealable order that the district court entered

during the short life of this case is the order denying the

plaintiffs' motion to remand. The denial of a motion to remand a

removed case to the state court involves a question of federal

subject matter jurisdiction and thus engenders de novo review.

See Rivet v. Regions Bank, 108 F.3d 576, 582 (5th Cir.), cert. 

granted on other grounds, 118 S. Ct. 31 (1997); County of St. 

Charles v. Missouri Family Health Council, 107 F.3d 682, 684 (8th 

Cir.), cert. denied, 118 S. Ct. 160 (1997). 

In this instance, the Union effected removal under 28

11

U.S.C. 1441(b) (permitting the removal of civil actions over

which United States District Courts have original federal

question jurisdiction). Hence, our review must focus on "whether

the federal district court would have had original jurisdiction

of the case had it been filed in that court." Grubbs v. General 

Elec. Credit Corp., 405 U.S. 699, 702 (1972); accord Chicago v. 

International College of Surgeons, 66 U.S.L.W. 4041, 4043 (U.S. 

Dec. 15, 1997). In the course of this inquiry, the removing

party bears the burden of persuasion vis- -vis the existence of

federal jurisdiction. See Dukes v. U.S. Healthcare, Inc., 57 

F.3d 350, 359 (3d Cir. 1995).

C. Federal Question Jurisdiction. C. Federal Question Jurisdiction. 

Federal district courts have original jurisdiction over

"federal question" cases that is, cases "arising under the

Constitution, laws, or treaties of the United States." 28 U.S.C.

1331. The gates of federal question jurisdiction are

customarily patrolled by a steely-eyed sentry the "well-pleaded

complaint rule" which, in general, prohibits the exercise of

federal question jurisdiction if no federal claim appears within

the four corners of the complaint. See International College of 

Surgeons, 66 U.S.L.W. at 4043; Gully v. First Nat'l Bank, 299 

U.S. 109, 113 (1936). At first blush, this rule appears to augur

well for the plaintiffs, who maintain that their complaint

alleges only state-law claims. Appearances, however, often are

deceiving.

Whereas preemption by federal law is a defense that

12

ordinarily does not give rise to federal question jurisdiction,

see Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987), 

"Congress may so completely pre-empt a particular area that any

civil complaint raising this select group of claims is

necessarily federal in character," Metropolitan Life Ins. Co. v. 

Taylor, 481 U.S. 58, 63-64 (1987). Section 301 preemption 

operates in this way. No less an authority than the Supreme

Court has declared that "the pre-emptive force of 301 is so

powerful as to displace entirely any state cause of action for

violation of contracts between an employer and a labor

organization." Franchise Tax Board v. Construction Laborers 

Vacation Trust, 463 U.S. 1, 23 (1983) (citation and internal 

quotation marks omitted). The upshot is that any such suit must

be regarded as "purely a creature of federal law, notwithstanding

the fact that state law would provide a cause of action in the

absence of 301." Id. 

This powerful preemption principle propels a

significant exception to the well-pleaded complaint rule the

artful pleading doctrine. The doctrine empowers courts to look

beneath the face of the complaint to divine the underlying nature

of a claim, to determine whether the plaintiff has sought to

defeat removal by asserting a federal claim under state-law

colors, and to act accordingly. See Federated Dep't Stores, Inc. 

v. Moitie, 452 U.S. 394, 397 n.2 (1981) (explaining that in an 

appropriate case "the removal court will seek to determine

whether the real nature of the claim is federal, regardless of

13

plaintiff's characterization") (quoting 14 Wright, Miller, &

Cooper, Federal Practice and Procedure 3722 at 564-66 (1976)). 

In other words, a plaintiff may not, by the expedient of artful

pleading, defeat a defendant's legitimate right to a federal

forum. See Milne Employees Ass'n v. Sun Carriers, Inc., 960 F.2d 

1401, 1406 (9th Cir. 1992) (discussing the artful pleading

doctrine in the context of section 301 preemption). If the claim

appears to be federal in nature that is, if it meets the

applicable test for one that arises under federal law then the

federal court must recharacterize the complaint to reflect that

reality and affirm the removal despite the plaintiff's professed

intent to pursue only state-law claims. See Metropolitan Life, 

481 U.S. at 64.

In this respect, we believe that DFR preemption

operates in much the same fashion as section 301 preemption.

While we have not heretofore inquired whether DFR preemption,

like section 301 preemption, works an exception to the well-

pleaded complaint rule, the answer seems obvious. Because

federal law completely governs the duties owed by an exclusive

collective bargaining representative to those within the

bargaining unit, see Vaca, 386 U.S. at 183, and because this 

manifestation of congressional will so closely parallels

Congress's intentions with regard to section 301, see Avco Corp. 

v. Aero Lodge No. 735, 390 U.S. 557, 561-62 (1968) (citing 

Lincoln Mills, 353 U.S. at 457), we hold that a district court 

possesses federal question jurisdiction when a complaint, though

14

garbed in state-law raiment, sufficiently asserts a claim

implicating the duty of fair representation. We also hold, as a

logical corollary, that DFR preemption warrants resort to the

artful pleading doctrine. Accord Richardson v. United 

Steelworkers, 864 F.2d 1162, 1169 (5th Cir. 1989) ("We hold that 

where the NLRA federal law duty of fair representation,

actionable in federal court, preempts a state-law claim, the suit

asserting such a claim . . . may be removed to federal court just

as the suit asserting state law claims preempted by section 301 .

. . may be removed under Avco and its progeny."). 

V. THE LITMUS TEST  V. THE LITMUS TEST

The foregoing articulations of complete preemption, the

standard of review, and the artful pleading doctrine are helpful,

but they do not tell us how certain a court must be that an

artfully pleaded complaint contains a federal question before

denying a motion to remand. Although our research has not

revealed any ready-made solution to this dilemma, we conclude

that the artful pleading doctrine permits a district court to

recharacterize a putative state-law claim as a federal claim when

a review of the complaint, taken in context, reveals a colorable

federal question within a field in which state law is completely

preempted. We summarize the reasoning that undergirds this

conclusion.

As a matter of common practice, a district court

confronted with a question of subject matter jurisdiction reviews

15

a plaintiff's complaint not to judge the merits, but to determine

whether the court has the authority to proceed. When conducting

this inquiry, the court only asks whether the complaint, on its

face, asserts a colorable federal claim. See Aldinger v. Howard, 

427 U.S. 1, 7 (1976) ("[W]here federal jurisdiction is properly

based on a colorable federal claim, the court has the right to

decide all the questions in the case . . . .") (citation and

internal quotation marks omitted); Northeast Erectors Assoc. v. 

Secretary of Labor, 62 F.3d 37, 39 n.1 (1st Cir. 1995) (observing 

that "federal question jurisdiction exists once the plaintiff has

alleged even a colorable federal claim"). As colorability is the

litmus test for the existence vel non of federal question 

jurisdiction, we see no reason why a court should not apply

precisely the same standard when called upon to determine whether

a complaint demands recharacterization under the artful pleading

doctrine. Indeed, because the critical inquiry when reviewing

the denial of a motion to remand is "whether the federal district

court would have had original jurisdiction of the case had it

been filed in that court," Grubbs, 405 U.S. at 702, the use of 

any other standard would be incongruous.4
 

4Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175 
(1909), is not to the contrary. Though the Siler Court stated in 
dictum that "the Federal question must not be merely colorable or
fraudulently set up for the mere purpose of endeavoring to give
the court jurisdiction," id. at 191-92, the Court used the word 
"colorable" in a different sense than we do today. "Colorable"
has two definitions: it may mean "seemingly valid or genuine,"
or it may mean "intended to deceive." Webster's New Collegiate 
Dictionary 220 (1981). The Siler Court unquestionably used the 
word in the latter sense, in a discussion about spurious claims.
See Siler, 213 U.S. at 191-92; compare Penn Mut. Life Ins. Co. v. 

16

This formulation is reinforced by the principles

articulated in Merrell Dow Pharm., Inc. v. Thompson, 478 U.S. 804 

(1986). There, the Supreme Court stressed that "determinations

about federal jurisdiction require sensitive judgments about

congressional intent, judicial power, and the federal system."

Id. at 810. Employing the colorability standard soothes such 

sensitivities, for where there is complete preemption, there

necessarily has been a triad of judicial determinations: that

Congress intended federal law to occupy the whole of a regulatory

field; that federal judicial power properly extends to actions

originally filed in state courts to the extent that they touch

upon that field; and that the exercise of such federal power does

not offend principles of federalism. See Franchise Tax Board, 

463 U.S. at 23.

VI. THE MERITS VI. THE MERITS

Having fashioned the standard by which we must gauge

the propriety of removal and remand, we conclude without serious

question that the instant complaint reveals a colorable question

of federal law and that, therefore, the district court did not

err when it denied the motion to remand.

We start with the plaintiffs' negligence claim and its

relationship to section 301 of the LMRA. This claim can survive

Rawson-based preemption under section 301 only if the Union acted 
 

Austin, 168 U.S. 685, 695 (1898) (noting appellate jurisdiction 
wherever there is a claim that a state law contravenes the
Constitution, as long as the claim is "real and colorable, not
fictitious and fraudulent"). We use the word in the "seemingly
valid or genuine" sense.

17

"in a way that might violate the duty of reasonable care owed to

every person in society." Rawson, 495 U.S. at 371. The claim 

asserts that, during the recruitment interviews, the Union

breached its duty of care to the interviewees. At oral argument,

counsel for BIW Deceived gave this a gloss, acknowledging that

the Union participated in the interview process pursuant to the

CBA. This being so, it is plausible (indeed, likely) that the

CBA details the nature and limits of the Union's participation in

the interview process and that the Union, therefore, would have

had a duty of care separate from any duty owed by third parties.

So viewed, the Union stands accused of violating a duty of care

that flowed to it pursuant to the CBA, and the plaintiffs' state-

law negligence claim, when recharacterized, passes the

colorability test. It is thus arguably preempted. See Rawson, 

495 U.S. 371-72 ("Pre-emption by federal law cannot be avoided by

characterizing the Union's negligent performance of what it does

on behalf of the members of the bargaining unit pursuant to the

terms of the collective-bargaining contract as a state-law

tort.").

Even were we to assume for argument's sake that the

plaintiffs' negligence claim, so recharacterized in light of

section 301, does not raise a colorable federal claim, we still

would be bound to affirm the district court's denial of remand on

the ground that the claim also is arguably preempted via the duty

of fair representation. The fact that the plaintiffs were not

members of the Union at the time the statements were made does

18

not command a contrary conclusion for a union owes a duty of fair

representation to nonmembers whom it has undertaken

constructively to represent. See, e.g., Steele v. Louisville & 

Nashville R.R. Co., 323 U.S. 192, 204 (1944); Nedd v. United Mine 

Workers, 556 F.2d 190, 200 (3d Cir. 1977); Amalgamated Transit 

Union Div. 822, 305 N.L.R.B. 946, 949-50 (1991). Here, taking 

the facts as limned by the plaintiffs, the Union plainly acted in

a representational capacity during the recruitment process.

Indeed, the plaintiffs, in their complaint, speak of the "special

relationship" that existed between them and the Union, and their

theory of the case seemingly hinges on their ability to establish

a symbiotic relationship of advocacy and dependence at the time

of the interviews. Under these circumstances, the negligence

claim, when recharacterized, sufficiently resembles a DFR claim

to pass the colorability test and thus support the exercise of

federal question jurisdiction.

Let us be perfectly clear. Because of the nearly empty

record, we cannot say with certitude whether we would find

ultimately that federal preemption applies in the instant case.

At this stage of the proceedings, however, we need not go that

far; to uphold the district court's exercise of federal question

jurisdiction, we need only conclude that, despite the plaintiffs'

state-law stylings, the complaint articulates at least one

colorable federal claim. Properly recharacterized, the

plaintiffs' complaint falls into this category.

To this point, we have trained our sights on the

19

negligence claim. While we believe that, for the most part, the

other claims contained in the plaintiffs' complaint similarly

state claims that, when recharacterized, are colorably federal in

nature, we need not probe the point too deeply. A federal court

that exercises federal question jurisdiction over a single claim

may also assert supplemental jurisdiction over all state-law

claims that arise from the same nucleus of operative facts. See 

28 U.S.C. 1367(a); see also International College of Surgeons, 

66 U.S.L.W. at 4043-44; Roche v. John Hancock Mut. Life Ins. Co., 

81 F.3d 249, 256 (1st Cir. 1996). Therefore, removal was

appropriate.

VII. CONCLUSION VII. CONCLUSION

We need go no further. For the reasons stated herein,

we conclude in the course of de novo review that the district

court correctly exercised federal question jurisdiction when it

denied the plaintiffs' motion to remand. Consequently, the

judgment to which the plaintiffs consented must stand.

Affirmed. Affirmed. 

20